# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

GABRIEL FERRIS,

        Petitioner,

v.                                       Case Number: 07-14401
                                        Honorable John Corbett O'Meara

JERI-ANN SHERRY,

        Respondent.

_____/

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY AND LEAVE TO PROCEED ON APPEAL *IN FORMA PAUPERIS*

Petitioner Gabriel Ferris, a state inmate currently confined at the Alger Maximum Correctional Facility in Munising, Michigan,[1] filed a *pro se* petition for writ of habeas corpus under 28 U.S.C. § 2254, alleging that he is incarcerated in violation of his constitutional rights. On May 27, 2004, Petitioner was found guilty of first-degree murder, MICH.COMP.LAWS § 750.316, by a Saginaw County, Michigan, circuit court jury. He was sentenced to life in prison for that conviction. For the reasons set forth, the Court will deny the petition. The Court will also decline to issue Petitioner a certificate of appealability and leave to proceed on appeal *in forma pauperis*.

---

[1]Petitioner was incarcerated at the Oaks Correctional Facility when he originally filed his habeas petition; however, he has since been transferred to the Alger Maximum Correctional Facility. The proper respondent in a habeas case is the habeas petitioner's custodian, which in the case of an incarcerated petitioner is the warden of the facility where the petitioner is incarcerated. Rule 2(a) of the Rule Governing § 2254 Cases; *see also Edwards v. Johns*, 450 F.Supp.2d 755, 757 (E.D. Mich. 2006). In most cases where a petitioner is transferred to a different facility after the petition has been filed, the Court would order an amendment of the case caption. However, because the Court is denying the petition in this case, it finds no reason to do so.

# I. BACKGROUND

The Michigan Court of Appeals summarized the facts of the case. The recitation of those

facts are entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1). They are as follows:

On the morning of June 15, 1974, the twenty-one-year-old victim was found strangled in an upstairs bedroom of the house where she resided. She was found lying on the floor almost completely naked. In addition, she had bruises on her face and abrasions that were consistent with struggling while pinned to the floor. From these facts, the medical examiner concluded that the victim had been strangled to death and that her positioning indicated that she had been raped.

While there was some physical evidence, including hairs, fibers, fingerprints, and a substance found inside the victim, the physical evidence was insufficient to identify a likely perpetrator. The police did, however, identify several suspects, including defendant, but because of the inconclusive nature of the physical evidence, no suspect was brought to trial for more than twenty years.

In 1994, a previously unidentified fingerprint was identified by the police, which triggered a reexamination of the evidence relating to the victim's murder. As a result of this reexamination and some interviews with old and new witnesses, defendant was arrested and charged with the victim's murder in 1995. In January of 1996, a jury found defendant guilty of felony murder. Defendant then appealed to this Court alleging that, as a result of numerous errors, he was deprived of a fair trial. This Court agreed that defendant had been deprived of a fair trial as a result of several errors, including the admission of other acts evidence in violation of MRE 404(b). Consequently, this Court reversed defendant's conviction and remanded the case for a new trial.

Defendant was retried in February of 2004. However, the trial court was compelled to declare a mistrial after the jury was unable to reach a verdict. In May of 2004, defendant was again tried before a jury. On May 27, 2004, the jury found defendant guilty of felony murder. On June 10, 2004, the trial court sentenced defendant to life in prison without the possibility of parole. Defendant then appealed to this Court as of right.

\* \* \*

At trial, several witnesses testified concerning statements made by defendant, which implicated him in the murder. Leroy Hoefling testified that he resided with defendant during the winter of 1974 to 1975 and that on two occasions he had overheard defendant phone the Saginaw police concerning the victim's murder. After the first call, Hoefling stated defendant told him that he wanted to see how

close the police were getting to him. After the second call, Hoefling stated that he asked defendant why he was calling the police and defendant became teary eyed and seemed as though he wanted to tell him something. Hoefling further stated that defendant told him that he had come back from his honeymoon to make up with the victim and was making love to the victim and did not mean to do it.

Three other witnesses, Linda Fairbanks, Patricia Skeba and Thomas Skeba testified concerning a car trip where the defendant allegedly made self-incriminating statements. Fairbanks testified that she was sixteen at the time of the car trip and living with defendant. She stated that, on the car trip in question, she became quite scared of defendant after he told Thomas, "I didn't mean to do it," over and over. Patricia stated that defendant described his relationship with the victim and then said "the killer didn't mean it." She then stated,

> He said that she had been raped before, and that she knew not to fight because it would hurt her. So she just laid there and accepted the fact that she was being raped. The killer, and-and said that when the killer was coming, there was no excitement in it, what do you call it, intercourse, I guess. He wanted more or so he said. He started choking and choking and made her struggle to have some–I don't know, movement, I guess, or something. Before the killer knew it, she was dead.

She further stated that, while describing these events, defendant became tense and breathed very hard. She also said he grabbed the headrest in front of him and squeezed it so hard his fingertips touched. She stated that defendant said the killer didn't mean to do it approximately 15-20 times. Thomas also described this same car trip, but testified that defendant never said "he did it." However, Thomas did state that defendant described how he thought the killer committed the murder and that defendant got a bit worked up during the conversation. Thomas also testified that Fairbanks[] said "did you hear what he [defendant] said?" and became quite upset.

Finally, Jeffrey McKenna testified that he was in the holding cell at court with defendant when defendant confessed to murdering the victim. McKenna stated that defendant told him that he had been fooling around with this other lady and that she said she was going to tell defendant's wife. McKenna said defendant told him that he went away on his honeymoon, "but not too far away so that he could come back and do what he had to do." He further testified that defendant described putting cough syrup in his wife's drink to get her to sleep while he returned to the other woman's house and strangled her.

In addition to this testimony, the prosecution presented evidence that defendant's fingerprints were found on the dresser next to the victim's head. While

there was testimony that defendant had been in the house on several occasions before, the peculiar location of the fingerprints near the bottom of the dresser and the fact that they were in an upward position strongly suggested that at some point in time defendant was prone in the exact location where the killer would have had to have been while strangling the victim.

In his defense, defendant presented the theory that someone else committed the murder while he was away on his honeymoon. In support of this theory, defendant noted that someone else's hair was found on and around the victim and that a fluid found inside the victim suggested that the victim was murdered by a sterile man. In addition, defendant argued that the evidence indicated that he was approximately an hours drive from the scene of the crime when the victim was murdered.

Testimony established that five hairs that were similar to hair from Tony Alvarez, a cousin of the victim's roommate, Maxine Braley, were found on or near the victim. A head hair was found near the victim's shoulder, three eyebrow hairs were found on the victim's chest and one pubic hair was found on the victim's pubic region. While the presence of these hairs might suggest that Alvarez may have been the killer, Richard Bisbing, plaintiff's trace evidence and serology expert, testified that the hairs were likely the product of secondary transfer. Bisbing testified that secondary transfer occurs when a hair is shed onto surface and is picked up and transferred by subsequent contact. Bisbing stated that the victim may have picked up the hairs from the rug as she struggled on the floor. This theory is consistent with testimony that established that Alvarez stayed at the home for a time and had access to the bedroom where the victim was found and with Bisbing's testimony that the hairs appeared to be shed hairs. Bisbing further noted that, in addition to the eyebrow hairs, two animal hairs were also found on the victim's chest and a pubic hair similar to Braley's hair was found on the victim's pubic region. Bisbing opined that the presence of the animal hairs and Braley's hair increased the likelihood that all the hairs originated through secondary transfer.

Dr. Ronald Hines, M.D., the pathologist who first examined the victim, testified that he found a thick and creamy exudate around the victim's cervix, which at the time he thought might be an ejaculate. Because the exudate did not contain semen, police originally believed they might be searching for a sterile killer. Testimony established that defendant is not sterile and was likely not sterile at the time of the murder. However, in a later statement, the original examiner noted that semen would not normally be thick and creamy more than one hour from the moment of ejaculation. Further, Dr. Kanu Virani, an expert in forensic pathology, testified that the vaginal samples taken from the body did not have the protein found in semen, but did contain vaginal epithelial cells. From this, he concluded, the exudate was not semen, but rather was likely normal vaginal excretions that pooled at a low point on the body.

Finally, while defendant did state in his 1976 statement to the police that at the time of the murder he was on his honeymoon in Tawas, which was more than an hour drive from the scene of the crime, the testimony of defendant's ex-wife, Terry Igaz, established that defendant had the opportunity to commit the murder. Igaz testified that on the evening of the murder, defendant stated that he wanted to return to Saginaw to see a hospitalized friend without her. She also stated that, after they both went to bed, she awoke to find defendant fully dressed. When asked, defendant told her that he had some business to take care of, but after she told him she did not want him to go, he undressed and got back into bed. Finally, she testified that at dawn she heard the sound of a car door slamming, the house door slamming, and the sound of defendant coming up the stairs. She also stated that she saw blood on defendant's clothing, which defendant explained came from a rabbit that he hit while driving around the point.

*People v. Ferris*, No. 256439, 2006 WL 473769, at *1-4 (Mich.Ct.App. Feb. 28, 2006) (citations and footnotes omitted).

Following his sentencing, Petitioner filed a direct appeal with the Michigan Court of Appeals. In February 2005, Petitioner, through counsel, also filed a motion for a new trial or a *Ginther*[2] hearing with the Saginaw County circuit court. On April 20, 2005, the trial court denied Petitioner's motion. *People v. Ferris*, No 95-010303-FC-5 (Saginaw County Circuit Court, Apr. 20, 2005). Then, on April 28, 2005, the trial court issued an order re-affirming its April 20, 2005 opinion and order. *People v. Ferris*, No 95-010303-FC-5 (Saginaw County Circuit Court, Apr. 20, 2005).

Petitioner subsequently submitted his brief with the Michigan Court of Appeals, raising the following six issues:

I. The guilty verdict is against the great weight of the evidence. Tony Alvarez left five hairs on and around the victim's body when he killed her. A thick fluid found in the victim's vagina may have been the semen of a sterile rapist, thus suggesting [Petitioner's] innocence. [Petitioner] was an hour from the murder scene at the relevant time. The evidence against [Petitioner], by contrast, consisted of testimony of a jailhouse snitch and drug abusers regarding vague, half-remembered statements made by [Petitioner] over the

_____

[2]*People v. Ginther*, 390 Mich. 436, 212 N.W.2d 922 (1973).

course of twenty years. [Petitioner] is entitled to a new trial.

II. On previous appeal, this court rejected the irrelevant and prejudicial "other acts" testimony of Terry Igaz. On re-trial, Judge Borello explicitly refused to honor this court's ruling. Judge Borrello again allowed Ms. Igaz to testify that [Petitioner] strangled her and forced sex upon her. The trial court abused its discretion where it allowed the introduction of this prejudicial and irrelevant testimony. [Petitioner] is entitled to a new trial.

III. [Petitioner] sought to admit multiple police and forensic documents dating back to the original investigation, all of which pointed to a dark-skinned, sterile killer. The trial court refused to allow [Petitioner] to admit these documents. The trial court denied [Petitioner] his right to present a defense where it prohibited the admission into evidence of reports and documents that established [Petitioner's] innocence. Petitioner is entitled to a new trial.

IV. The trial court denied [Petitioner] his due process right to a fair trial where it expressed annoyance with defense counsel and lectured counsel on basic aspects of evidentiary law. [Petitioner] is entitled to a new trial.

V. The prosecution committed misconduct where it withheld multiple pieces of exculpatory evidence from the defense and where it introduced irrelevant but inflammatory evidence against [Petitioner]. [Petitioner] is entitled to a new trial.

VI. Trial counsel provided ineffective assistance. Counsel failed to object to damaging, inadmissible testimony. Counsel stipulated to the admission of an uncross-examined statement given by a witness to police officers thirty years before trial. Counsel failed to assert available defenses. Counsel denied [Petitioner] his federal and state constitutional rights to the effective assistance of counsel. [Petitioner] is entitled to a new trial or to remand for a *Ginther* hearing.

Petitioner also filed a motion to remand for an evidentiary hearing. On August 1, 2005, the

Michigan Court of Appeals issued an order denying Petitioner's motion to remand "because the

Circuit Court has already rendered a decision on the issues and [Petitioner] failed to demonstrate by

affidavit or offer of proof the facts to be established at a hearing. *People v. Ferris*, No. 256439

(Mich.Ct.App. Aug. 1, 2005). Then, on February 28, 2006, the Michigan Court of Appeals issued

an opinion affirming Petitioner's conviction. *People v. Ferris*, No. 256439, 2006 WL 473769

(Mich.Ct.App. Feb. 28, 2006).

Subsequently, Petitioner filed an application for leave to appeal the Court of Appeals' decision with the Michigan Supreme Court, raising the same six issues raised in the Court of Appeals. He also attempted to file a *pro per* supplemental pleading with the Michigan Supreme Court, but it was rejected because it was improperly filed. On October 13, 2006, the Michigan Supreme Court issued an order denying Petitioner's application "because are not persuaded that the questions presented should be reviewed by this Court." *People v. Ferris*, 477 Mich. 886, 722 N.W.2d 217 (2006) (Cavanagh and Kelly, JJ., dissenting).

On October 16, 2007, Petitioner filed this habeas petition, raising the same six claims raised in both state appellate courts.

## II. STANDARD OF REVIEW

28 USC § 2254(d) imposes the following standard of review that a federal court must utilize when reviewing applications for a writ of habeas corpus:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Federal courts are therefore bound by a state court's adjudication of a petitioner's claims unless the state court's decision was contrary to or involved an unreasonable application of clearly

established federal law.  *Franklin v. Francis*, 144 F.3d 429, 433 (6th Cir. 1998).  This Court must presume the correctness of a state court's factual determinations. 28 U.S.C. § 2254(e)(1).

The United States Supreme Court has explained the proper application of the "contrary to" clause as follows:

> A state-court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases.

> A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from [the Court's] precedent.

*Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).

With respect to the "unreasonable application" clause of § 2254(d)(1), the United States Supreme Court held that a federal court should analyze a claim for habeas corpus relief under the "unreasonable application" clause when "a state-court decision unreasonably applies the law of this Court to the facts of a prisoner's case."  *Id.* at 409.  The Court defined "unreasonable application" as follows:

> [A] federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable.

> [A]n unreasonable application of federal law is different from an incorrect application of federal law . . . .  Under § 2254(d) (1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable.

*Id.* at 409-11.

With that in mind, the Court proceeds to the merits of Petitioner's claims.

## III. DISCUSSION

### A. Claim I–Great Weight of the Evidence

In his first habeas claim, Petitioner argues that the great weight of the evidence does not support the jury's guilty verdict. Petitioner's first habeas claim is without merit because it is not cognizable upon federal habeas review.

With respect to Petitioner's this claim, the Michigan Court of Appeals considered this issue, but rejected it, stating:

> Defendant first argues that he is entitled to a new trial because the verdict was against the great weight of the evidence. We disagree.
>
> This Court reviews for an abuse of discretion the trial court's denial of a motion for a new trial on the ground that the verdict was against the great weight of the evidence. "An abuse of discretion can be found only where 'an unprejudiced person, considering the facts on which the trial court [relied], would find no justification or excuse for the ruling made.'" Further, a trial court may only grant a new trial on the ground that the verdict was against the great weight of the evidence "if the evidence preponderates heavily against the verdict so that it would be a miscarriage of justice to allow the verdict to stand."
>
> ***
>
> While the evidence cited by defendant might suggest to some persons that someone other than defendant strangled the victim, it cannot be said to preponderate so heavily against the verdict that it would be a miscarriage of justice to let the verdict stand. Rather the evidence in this case is such that different minds might naturally and fairly come to different conclusions and, therefore, "the judge may not disturb the jury findings although his judgment might incline him the other way." Consequently, the trial court did not abuse its discretion in refusing to grant defendant a new trial on the ground that the evidence was against the great weight of the evidence.

*Ferris*, 2006 WL 473769, at *1,4 (citations and footnotes omitted).

The Court concludes that this claim is not cognizable on habeas review. It is well established that habeas review is not available to correct errors of state law. *Estelle v. McGuire*, 502 U.S. 62,

67-68 (1991) ("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *see also Jackson v. Ylst*, 921 F.2d 882, 885 (9th Cir.1990) (a federal court on habeas review "ha[s] no authority to review a state's application of its own laws ."). The federal constitution requires only that the evidence be sufficient to sustain the conviction under the standard established in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Where the evidence is sufficient as a matter of due process, a claim that the verdict was against the weight of the evidence presents a state law issue which is not cognizable on habeas review. *See Douglas v. Hendricks*, 236 F.Supp.2d 412, 435-36 (D.N.J. 2002); *Dell v. Straub*, 194 F.Supp.2d 629, 648 (E.D. Mich. 2002); *Correa v. Duncan*, 172 F.Supp.2d 378, 381 (E.D.N.Y. 2001); *cf. Tibbs v. Florida*, 457 U.S. 31, 44 (1982) (noting in a different context that "trial and appellate judges commonly distinguish between weight and sufficiency of the evidence."). In short, "[a] federal habeas court has no power to grant habeas corpus relief because it finds that the state conviction is against the 'weight of the evidence.'" *Young v. Kemp*, 760 F.2d 1097, 1105 (11th Cir. 1985).

The Court concludes that the trial court's decision whether to grant Petitioner a new trial on the basis that the jury's guilty verdict was against the great weight of the evidence is a matter of Michigan law and is not reviewable by a federal habeas court.

Thus, the only question here is whether the evidence was constitutionally sufficient to prove all the elements of the offense for which Petitioner was convicted beyond a reasonable doubt.

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship*, 397 U.S. 358, 364 (1970). Under the pre-AEDPA

standard for habeas review of sufficiency of the evidence challenges "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319 (emphasis in original). Reviewing courts must view the evidence, draw inferences and resolve conflicting inferences from the record in favor of the prosecution. *See Neal v. Morris*, 972 F.2d 675, 678 (6th Cir. 1992). In determining the sufficiency of the evidence, the court must give circumstantial evidence the same weight as direct evidence. *See United States v. Farley*, 2 F.3d 645, 650 (6th Cir. 1993). However, under the amended version § 2254(d)(1) a federal habeas court must apply a more deferential standard of review of the state court decision. Thus, the question here is whether the Michigan Court of Appeals's application of the *Jackson* standard was reasonable. *See Gomez v. Acevedo*, 106 F.3d 192, 198-200 (7th Cir. 1997), *vacated on other grounds sub nom. Gomez v. DeTella*, 522 U.S. 801 (1998); *Restrepo v. DiPaolo*, 1 F.Supp.2d 103, 106 (D. Mass. 1998).

While a challenge to the sufficiency of the evidence on an established element of an offense raises a federal constitutional claim cognizable in a habeas corpus proceeding, *see Jackson*, 443 U.S. at 324, "[t]he applicability of the reasonable doubt standard . . . has always been dependent on how a State defines the offense that is charged in any given case." *Patterson v. New York*, 432 U.S. 197, 211 n. 12 (1977); *see also*, *Jackson*, 443 U .S. at 324 n. 16; *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975). Thus, "[a] federal court must look to state law to determine the elements of the crime." *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999).

Under Michigan law, the elements of felony murder are: (1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great

bodily harm with knowledge that death or great bodily harm was the probable result, (3) while committing, attempting to commit, or assisting in the commission of any of the felonies enumerated in MICH. COMP. LAWS § 750.316. *People v. Smith*, 478 Mich. 292, 318-19, 733 N.W.2d 351, 365 (2007).

Against that backdrop, the Court concludes that the record supports the state courts' adjudication and that Petitioner has failed to establish that those adjudications were either contrary to, or an unreasonable application of, clearly established Supreme Court precedent. Although reasonable minds could differ, the jury in this case found that there was sufficient evidence presented to find Petitioner guilty of first-degree felony murder. He is therefore not entitled to habeas relief on this claim.

## B.  Claim II– Other Acts Evidence

In his second habeas claim, Petitioner alleges that the trial court erroneously admitted other acts evidence, in particular prosecution witness Terry Igaz's testimony that Petitioner strangled her and forced sex upon her in the past. Again, with respect to this claim, the perceived error concerns the correct application of the Michigan Rules of Evidence and it is therefore not cognizable on federal habeas review. The Michigan Court of Appeals, the last court to issue a reasoned decision in this case, first determined that the law of the case doctrine did not bar the trial court from reconsidering the admissibility of the other acts testimony by defendant's ex-wife, stating:

> In his first appeal to this Court, defendant argued, among other things, that he was deprived of a fair trial by the admission of other acts evidence in contravention of MRE 404(b). Specifically, defendant argued that the testimony by Igaz that he assaulted her, grabbed her around the throat, choked her and either raped her or attempted to rape her was not admitted for a relevant purpose and was prejudicial. This Court agreed with defendant and, in a two-to-one opinion, reversed defendant's conviction in part based on the erroneous admission of prejudicial other acts testimony.

In a motion in limine dated August 23, 2000, plaintiff moved the trial court to again permit the admission of Igaz's testimony concerning these other acts at defendant's new trial. In a hearing held on September 18, 2000, the trial court heard arguments on this motion. At the hearing, the trial court noted that, under the law of the case doctrine, it was bound to exclude the evidence unless it determined that subsequent Supreme Court decisions changed the law. Plaintiff responded by arguing that, under *People v. Phillips (After Second Remand)*, 227 Mich. App. 28; 575 N.W.2d 784 (1997), a trial court is not bound by the law of the case doctrine where it determines that this Court's decision was clearly erroneous. The trial court recognized that there was considerable confusion about the application of MRE 404(b) even among the appellate courts and determined that it would take the matter under advisement, review the development of the law subsequent to the 1999 decision of this Court reversing defendant's conviction, and determine whether the law had changed. In an opinion and order dated August 20, 2003, the trial court determined that is was not bound by the law of the case doctrine. It explained,

> This Court finds that the two Judges that found this Court in error in allowing the testimony of Terry Igaz [defendant's ex-wife] pursuant to MRE 404(b) to be clearly erroneous in view of the subsequent decisions of the Michigan Supreme Court in *People v. Sabin (After Remand)*, 463 Mich. 43[; 614 N.W.2d 888] (2000); *People v. Hine*, 467 Mich. 242, 244[; 650 N.W.2d 659] (2002); *People v. Katt*, 248 Mich App 282, 303-305[; 639 N.W.2d 815] (2001). To continue to follow such an erroneous decision would create injustice.

For this reason, the trial court permitted the admission of this testimony at defendant's new trial.

In *Grievance Administrator v. Lopatin*, 462 Mich. 235; 612 N.W.2d 120 (2000), our Supreme Court described the nature of the law of the case doctrine.

> Under the law of the case doctrine, "if an appellate court has passed on a legal question and remanded the case for further proceedings, the legal questions thus determined by the appellate court will not be differently determined on a subsequent appeal in the same case where the facts remain materially the same." The appellate court's decision likewise binds lower tribunals because the tribunal may not take action on remand that is inconsistent with the judgment of the appellate court. Thus, as a general rule, an appellate court's determination of an issue in a case binds lower tribunals on remand and the appellate court in subsequent appeals.

The purpose of the law of the case doctrine is to "'maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing

lawsuit.'"

The law of the case doctrine normally applies regardless of the correctness of the prior determination because an appellate court lacks jurisdiction to modify its own judgments except on rehearing. Indeed, where "a litigant claims error in the first pronouncement, the right of redress rests in a higher tribunal." However, where there has been an applicable intervening change in the law, where the facts have materially changed, or where the doctrine must yield to a competing doctrine, the law of the case will not prevent this Court from revisiting an issue already decided. In addition, in a criminal case this Court has the power to grant the defendant a new trial at any time where justice has not been done.

In this case's prior appeal, a majority of this Court determined that the other acts testimony of defendant's ex-wife was not admissible for a proper purpose under MRE 404(b) and, even if it were admissible for a proper purpose, the danger that the jury would improperly use the other acts testimony substantially outweighed its probative value under MRE 403. It is clear that the relevant facts have not changed, there are no superior competing constitutional doctrines, and this Court is not being asked to disregard the law of the case in order to grant defendant a new trial. Hence, the only issue is whether the trial court correctly determined that there was an intervening change in the law that removed this issue from the application of the law of the case doctrine.

In *Sabin* our Supreme Court clarified when evidence is admissible under MRE 404(b) to show a defendant's plan, scheme, or system in doing an act. The Court first affirmed its adherence to the approach to other acts evidence stated in *People v. VanderVliet*, 444 Mich. 52; 508 N.W.2d 114 (1993). It then clarified that "evidence of similar misconduct is logically relevant to show that the charged act occurred where the uncharged misconduct and the charged offense are sufficiently similar to support an inference that they are manifestations of a common plan, scheme, or system." Under this theory, "the jury is asked to infer the existence of a common system and consider evidence that the defendant used that system in committing the charged act as proof that the charged act occurred." The Court further explained that the degree of similarity required for this evidence is less than that needed to prove identity. Finally, the Court explicitly rejected the notion that logical relevance is limited "to circumstances in which the charged and uncharged acts are part of a single continuing conception or plot."

In this Court's previous opinion, the majority analyzed the admissibility of defendant's ex-wife's other acts testimony under the test stated in *VanderVliet*, *supra*, but did not have the benefit of the clarifications provided by *Sabin*. We agree with the trial court that *Sabin* represented a significant intervening development of the law applicable to MRE 404(b), which removed this issue from the application of the law of the case doctrine. Therefore, the trial court could properly reconsider the

admissibility of the other acts evidence.

*Ferris*, No. 256439, 2006 WL 473769, at *4-9 (citations and footnotes omitted).

After the Court of Appeals determined that the law of the case doctrine did not apply in this case, it then went on to discuss whether the other acts evidence was still admissible under Mich.R.Evid. 404(b):

> In *VanderVliet, supra*, our Supreme Court adopted the approach to other acts evidence enunciated by the United States Supreme Court in *Huddleston v. United States*, 485 U.S. 681, 691-692; 108 S. Ct. 1496; 99 L. Ed. 2d 771 (1988).

>> First, the prosecutor must offer the other acts evidence under something other than a character to conduct or propensity theory. MRE 404(b). Second, the evidence must be relevant under MRE 402, as enforced through MRE 104(b), to an issue of fact of consequence at trial. Third, under MRE 403, a "'determination must be made whether the danger of undue prejudice [substantially] outweighs the probative value of the evidence in view of the availability of other means of proof and other facts appropriate for making decision of this kind under Rule 403.'" Finally, the trial court, upon request, may provide a limiting instruction under MRE 105.

> The prosecution bears the initial burden of establishing the relevance of the evidence to prove a fact other than character or propensity to commit a crime. "Where the only relevance of the proposed evidence is to show the defendant's character or the defendant's propensity to commit the crime, the evidence must be excluded."

> In its brief in support of its motion in limine requesting the admission of testimony by Igaz concerning other acts committed by defendant, the prosecution argued that the other acts testimony helped establish defendant's intent, identity, and established a pattern or method to how defendant sexually assaulted women with whom he had a relationship. After determining that the law of the case doctrine did not apply, the trial court permitted Igaz to testify concerning the other acts, but limited the use of this testimony to prove that defendant "used a plan, system, or characteristic scheme . . . ." Further, the trial court instructed the jury that this was the only permissible use for that testimony and admonished them not to "convict the defendant here because you think he is guilty of other bad conduct."

> On direct examination, Igaz testified about physical abuse she suffered at the

15

hands of defendant. She explained that, "sometimes, he would grab me by the neck, and it didn't matter which way if he grabbed me by the side or the front and throw me around, and sometimes he would choke me, he'd pinch, twist-pinch, twist and pull the skin on my neck . . . ." When asked what would prompt defendant to do such things, Igaz stated that defendant would attack her in this way when he wanted "me to do things that I didn't want to do or he–he wanted me to obey him." She further testified that defendant would sometimes use this technique to get her to do things of a sexual nature.

Similar misconduct "is logically relevant to show that the charged act occurred where the uncharged misconduct and the charged offense are sufficiently similar to support an inference that they are manifestations of a common plan, scheme, or system." In this case, Igaz's testimony concerning defendant's other acts is sufficiently similar to the evidence concerning the circumstances surrounding the victim's death that the jury might properly "infer the existence of a common system and consider evidence that the defendant used that system in committing the charged act as proof that the charged act occurred."

In his 1976 statement to the police, defendant stated that he had intended to have a date with the victim on the night before his marriage. He described this night as his "stag" night, but explained that he was unable to go because his wife-to-be got him "all locked up in some crap." Defendant also told the police that on the same night that they were supposed to have the date, the victim learned about his marriage and became very upset. The jury also learned from Igaz that, on the day she and defendant arrived in Tawas for their honeymoon, defendant wanted to return to Saginaw without her. Igaz also testified that defendant made several telephone calls from the home in Tawas, allegedly to his hospitalized friend, but hung up whenever he realized that Igaz saw him. From this evidence and other evidence presented, the jury could infer that defendant was determined to have his "stag" night with the victim and that he contacted her for that purpose, but that she was not cooperative. They could also infer that defendant did in fact leave Tawas on the night of the murder and met up with the victim at her home. Additionally, from the evidence concerning the victim's injuries, the jury could conclude that the victim refused to participate in the requested sexual activities after defendant arrived and, as a result, defendant utilized his common plan, scheme, or system of grabbing, hitting, throwing, and choking the victim in order to get the victim to comply with his sexual requests. Hence, the other acts evidence was relevant to show that the underlying felony of rape or attempted rape occurred, i.e. for a purpose other than to prove that the defendant had bad character and acted in conformity with that character on a particular occasion. Furthermore, while the other acts evidence had the potential for prejudice, whether the probative value was substantially outweighed by the potential prejudice is a close question. Because a trial court's decision on a close evidentiary question ordinarily cannot be an abuse of discretion, we cannot conclude that the trial court abused its discretion by permitting the other acts testimony in question.

Consequently, the trial court did not err when it permitted Igaz to testify about the other acts in question.

*Ferris*, No. 256439, 2006 WL 473769, at *4-9 (citations and footnotes omitted).

As stated, it is "not the province of a federal habeas court to reexamine state-court determinations on state-court questions." *Estelle*, 502 U.S. at 67-68. A federal court is limited in federal habeas review to deciding whether a state court conviction violates the Constitution, laws, or treaties of the United States. *Id.* Thus, errors in the application of state law, especially rulings regarding the admissibility of evidence, are usually not questioned by a federal habeas court. *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000); *see also Bridinger v. Berghuis*, 429 F.Supp.2d 903, 908-09 (E.D. Mich. 2006) (federal habeas courts have no authority to interfere with perceived errors in state law unless the petitioner is denied fundamental fairness in the trial process).

As to the admission of prior acts, the United States Supreme Court has declined to hold that similar other acts evidence is so extremely unfair that its admission violates fundamental conceptions of justice. *See Dowling v. United States*, 493 U.S. 342, 352-53 (1990). Thus, "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). Consequently, there is no Supreme Court precedent that the state court decisions could be deemed "contrary to" under 28 U.S.C. § 2254(d)(1). *Id.* at 513; *Adams v. Smith*, 280 F.Supp.2d 704, 716 (E.D. Mich. 2003).

Furthermore, even if Petitioner states a cognizable claim, he is not entitled to relief. Petitioner has not shown that the admission of the disputed evidence rendered his trial fundamentally unfair.

The trial court's decision whether to admit evidence *vis-à-vis* the Michigan Rules of

Evidence is a matter of Michigan law and is not reviewable by a federal habeas court. Against that backdrop, the Court concludes that this claim is not cognizable upon federal habeas review, and therefore, Petitioner is not entitled to habeas relief.

## C. Claim IV–Judicial Misconduct

In his fourth claim, Petitioner alleges that the trial judge committed judicial misconduct by expressing annoyance with defense counsel and by lecturing defense counsel concerning basic aspects of evidentiary law. In addressing this claim, the Michigan Court of Appeals stated:

> "A trial court has wide, but not unlimited, discretion and power in the matter of trial conduct." Nevertheless, a defendant may be entitled to a new trial if the trial court's conduct "pierces the veil of judicial impartiality . . . ." The veil of judicial impartiality is destroyed where the trial court berates, scolds, and demeans a defendant's trial counsel so as to hold him up to contempt in the eyes of the jury. The test to determine whether a new trial is mandated is whether "the trial court's conduct or comments 'were of such a nature as to unduly influence the jury and thereby deprive the appellant of his right to a fair and impartial trial.'" However, in assessing the trial court's comments, this Court will not take the comments out of context in order to show bias, but rather will examine them in the context of the whole record.

> On review of the entire record, we are not left with the impression that the trial court's comments unduly influenced the jury and, thereby, deprived defendant of a fair trial. The comments arose during the defendant's trial counsel's direct examination of retired detective Robert Carlson. Defendant's trial counsel repeatedly attempted to get Carlson to testify concerning statements made by persons Carlson had interviewed during his investigation of the victim's murder. In response to these attempts, the prosecutor repeatedly objected, which disrupted the orderly flow of testimony. After a series of these exchanges, the trial court interrupted and explained to defendant's trial counsel the types of things that Carlson could testify to without running afoul of the hearsay rule. Despite this, the objectionable questions persisted. Thereafter, the trial court again explained the types of things the witness could testify about without violating the hearsay rule. While the trial court's later comments do indicate that the trial court had become annoyed, they were not so intemperate as to hold defendant's trial counsel up to contempt in the eyes of the jury. Furthermore, the trial court's instruction that the jury should not be influenced by the trial court's rulings or comments and should decide the case only from the evidence, cured any minimal impact that this exchange may have had on the jury. Therefore, a new trial is not warranted on this ground.

*Ferris*, 2006 WL 473769, at *10 (citations and footnotes omitted).

"The due process clause of the Fourteenth Amendment guarantees a criminal defendant, as any litigant, the right to a fair trial in a fair tribunal." *Alley v. Bell*, 307 F.3d 380, 386 (6th Cir. 2002) (internal citations omitted). In *Alley*, the Sixth Circuit stated that it was incumbent upon a habeas court to overturn a state court decision in cases in which judicial bias is evident:

> If a habeas court determines that bias by a state judge resulted in a constitutional violation, then the court is required to overturn the state court decision. This court has looked to the Supreme Court's decision in *Liteky v. United States*, 510 U.S. 540 (1994) to provide the standard for deciding judicial bias claims; in that case, the Court explained that "the pejorative connotation of the terms 'bias' and 'prejudice' demands that they be applied only to judicial predispositions that go beyond what is normal and acceptable."

*Id.* at 386 (internal citations omitted).

In this case, there is no evidence of judicial bias on the part of Judge Leopold Borrello. As the Court of Appeals found, Judge Borrello's comments did not unduly influence the jury against Petitioner so as to render Petitioner's trial unfair. In fact, Judge Borrello's comments during defense counsel's direct examination of Detective Robert Carlson were made in an effort to control the conduct of the trial. In his relatively short direct examination of Detective Carlson, who was one of the original 1974 investigators, defense counsel attempted to elicit hearsay testimony more than a dozen times. Each time, the prosecutor made an appropriate objection.

Judge Borrello did not run rough shod over defense counsel, but rather gave defense counsel every opportunity to conduct his direct examination in accordance with the Michigan Rules of Evidence. Moreover, during the prosecutor's cross-examination of Detective Carlson, Judge Borrello further demonstrated that his rulings regarding the hearsay issues were not biased against Petitioner. Following the prosecutor's questioning of Detective Carlson concerning what Petitioner

had told Carlson during Carlson's interview with Petitioner in June 1974, Judge Borrello explained

to the jury why he was allowing such testimony to proceed:

> THE COURT:  Ladies and gentleman, so you don't think that I don't know what I'm doing, I allowed the answers of what [Petitioner] says.  That's an exception to the hearsay rule, and I'm not going to get into all the exceptions . . . .

> But [in] any event, what the [Petitioner] says to the investigating officer is admissible.  It's an exception to the hearsay rule.

> \* \* \*

> So that you don't believe that I'm allowing this but I didn't allow that, the reason I'm allowing this, which is clearly hearsay, [is] because it's statements made by the [Petitioner] to investigating officer is [sic] admissible.  There are exceptions

> to that, but I'm not going to get into that.  That's why I'm allowing this line of questions.  All right.  Just in case you were wondering.  And I'm sure you were.

Trial Tr. vol. VIII, 50-51, May 25, 2004.

Here, there has been no showing that Judge Borrello was biased or prejudiced against

Petitioner.


Additionally, as the Court of Appeals noted, Judge Borello also issued an instruction prior

to the commencement of deliberations that the jurors were to decide the case solely on the evidence

presented at trial:

> THE COURT:  My comments, rulings, questions, and instructions are also not evidence.  It is my duty to see that the trial is conducted according to the law and to tell you the law that applies to this case.  However, when I make a comment or give an instruction, I am not trying to influence your vote or express a personal opinion about the case.  If you believe that I have an opinion about how you should decide this case, you must pay no attention to that opinion.  You are the only judges of the facts, and you should decide this case only from the evidence.

Trial Tr. vol. IX, 107,  May 26, 2004.

Absent contrary evidence, it is presumed that juries follow the instructions that they are given. *Washington v. Hofbauer*, 228 F.3d 689, 705 (6th Cir. 2000).

Moreover, to the extent that Petitioner asserts that Judge Borrello exhibited bias because he admitted the other acts evidence that Petitioner alleges in his second habeas claim, such an allegation of bias is unfounded. For the reasons outlined in the preceding section, the Court concludes that the trial court's decision to admit such evidence is not cognizable upon federal habeas review. Moreover, the Michigan Court of Appeals found that such a ruling was in accordance with Michigan law. Given that determination by the Court of Appeals, it cannot be said that the ruling in question evidences a biased or prejudiced predisposition against Petitioner on the part of Judge Borrello.

Against that backdrop, the Court finds that Petitioner's right to a fair trial was not violated because there is no evidence of bias or prejudice on the part of Judge Borello. Accordingly, the state court adjudications of this claim were neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent, or an unreasonable determination of the facts. Thus, Petitioner is not entitled to habeas relief regarding his fourth habeas claim.

## D. Claims III and V– Right to Present a Defense and Prosecutorial Misconduct

In his third habeas claim, Petitioner alleges that he was denied his federal constitutional right to present a defense as found in both the Sixth Amendment and the due process clause of the Fourteenth Amendment. Specifically, Petitioner contends that the trial court unconstitutionally inhibited his defense by prohibiting the admission into evidence of certain reports and documents, which Petitioner argues supports his claim of actual innocence. In his fifth habeas claim, Petitioner asserts that the prosecutor violated his right to a fair trial by withholding multiple pieces of exculpatory evidence from the defense and by introducing irrelevant and inflammatory evidence

against Petitioner at trial, all of which Petitioner argues constitutes prosecutorial misconduct. Petitioner raised both his third and fifth habeas claims on direct appeal to the Michigan Court of Appeals, but the Court of Appeals found the claims were not properly preserved for appellate review and reviewed the claimed errors for plain error affecting Petitioner's substantial rights. As a result, this Court finds that these claims are procedurally defaulted.

A procedural default occurs when a state procedure bars a petitioner's claim and the state court "clearly and expressly" relied on that bar. *Harris v. Reed*, 489 U.S. 255, 263 (1989). Under Michigan law, failure to make a contemporaneous objection serves as an independent and adequate state-law bar. *People v. Callon*, 256 Mich.App. 312, 329 (2003); *People v. Stanaway*, 446 Mich. 643, 687 (1994). Likewise, under Michigan law, a contemporaneous objection based on a ground different than the one that is presented for appellate review also serves as an independent and adequate state-law bar. *People v. Kimble*, 470 Mich. 305, 309 (2004). The United States Supreme Court has stated that "in all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas corpus review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Lundgren v. Mitchell*, 440 F.3d 754, 763 (6th Cir. 2006) (citing *Coleman v. Thompson*, 501 U.S. 722, 749 (1991)).

Here, Petitioner failed to make a contemporaneous objection at trial concerning his fifth habeas claim alleging prosecutorial misconduct. Additionally, Petitioner failed to make a contemporaneous objection in the trial court based on the same ground on which he objected in the Michigan Court of Appeals *vis-à-vis* his third habeas claim, alleging that the trial court

unconstitutionally inhibited his defense by prohibiting the admission into evidence of certain reports and documents. Although the Michigan Court of Appeals reviewed Petitioner's third and fifth habeas claims for plain error (otherwise known as manifest injustice), such a review does not excuse Petitioner's procedural default. *Paprocki v. Foltz*, 869 F.2d 281, 284-85 (6th Cir. 1989). Consequently, Petitioner's third and fifth habeas claims are procedurally defaulted and this Court is barred from reviewing them for a violation of habeas corpus.

Furthermore, Petitioner cannot overcome this procedural default because he has failed to establish cause and prejudice to excuse the default, or demonstrate that failure to consider these two claims would result in a fundamental miscarriage of justice. Petitioner attempts to show cause for the procedural default of these claims by alleging in his sixth habeas claim that his trial counsel rendered ineffective assistance of counsel.

The Sixth Amendment right to counsel and the right to effective assistance of counsel protect the fundamental right to a fair trial. *Strickland v. Washington*, 466 U.S. 668 (1984). To show that he was denied the effective assistance of counsel under federal constitutional standards, Petitioner must demonstrate that, considering all of the circumstances, counsel's performance fell below the objective standard of reasonableness and so prejudiced Petitioner that he was denied a fair trial and a reasonable probability exists that, but for counsel's conduct, the result would have been different. *Id.* at 694.

Judicial scrutiny of counsel's performance must be highly deferential. Courts presume that an attorney is competent and the burden rests upon Petitioner to show a constitutional violation. *United States v. Pierce*, 62 F.3d 818, 833 (6th Cir. 1995). A strong presumption exists that counsel's behavior lies within the wide range of reasonable professional assistance. *O'Hara v. Wigginton*, 24

F.3d 823, 828 (6th Cir. 1994). A petitioner must also overcome the presumption that under the circumstances, the challenged action might be considered sound trial strategy. *Strickland*, 466 U.S. at 689. The *Strickland* Court cautioned that courts must take care to avoid second-guessing strategic decisions that did not prove successful. *Id.* The performance component of the *Strickland* test of ineffective assistance of counsel need not be addressed first, if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, that course should be followed. *Smith v. Robbins*, 528 U.S. 259, 286, n. 14 (2000).

With respect to Petitioner's third habeas claim, he alleges that defense counsel failed to argue for the admission of the relevant reports and documents based on the correct standards under Michigan law, i.e. Michigan Rules of Evidence 803(16) and 803(24) and *People v Katt,* 468 Mich. 272 (2003). With respect to Petitioner's fifth habeas claim, he makes no allegation that counsel rendered ineffective assistance by failing to object to the prosecution's alleged withholding of multiple pieces of exculpatory evidence from the defense. Rather, Petitioner argues that counsel was ineffective for failing to object to a laundry-list of irrelevant and inflammatory pieces of evidence introduced by the prosecution at trial.

Here, the Court finds that Petitioner has failed to meet his burden of showing a constitutional violation. He was not prejudiced by trial counsel's failure to argue for the admission of the relevant reports and documents based on Mich.R.Evid. 803(16) and 803(24) and *Katt*. As the Court of Appeals determined in its review for plain error, "[Petitioner] clearly was not prevented from presenting the claimed defense by the trial court's refusal to grant the motion to admit the police reports." *Ferris*, 2006 WL 473769, at *9. The prosecutor successfully argued that, contrary to the

assertions of the defense, the fact that detectives originally thought the killer was sterile and that [Dr. Ronald] Hines in 1974 apparently told detectives to look for someone with no sperm was brought out during the testimony of several witnesses –Richard Bisbing, Detective Thomas Reeder, Detective Robert Carlson, and Detective Ronald Herzberg.

Likewise, Petitioner was not prejudiced by trial counsel's failure to object to pieces of evidence, specifically testimony from key prosecution witnesses, that Petitioner contends was irrelevant and inflammatory. For all the reasons listed by the Court of Appeals in its review for plain error, the Court concludes that the prosecutor did not engage in prosecutorial misconduct. Therefore, there was no basis for defense counsel to make a credible objection, as the Court of Appeals subsequently concluded in its review of Petitioner's ineffective assistance of counsel allegation with respect to this matter.

Consequently, because there was no violation of the *Strickland* standard, Petitioner's argument concerning ineffective assistance of counsel, as presented in his sixth habeas claim in relation to his third and fifth habeas claims, is without merit. Because such an ineffective assistance of counsel argument lacks merit, it cannot serve as cause for the procedural default of Petitioner's third and fifth habeas claims.

Additionally, the procedural default of Petitioner's third and fifth habeas claims also cannot be excused because Petitioner has failed to establish prejudice. Petitioner alleges that his defense was prejudiced because the trial court did not permit him to present certain police reports and documents to the jury. However, for the reasons previously articulated in this section's *Strickland* analysis above, the fact that Petitioner was not permitted to introduce such reports and documents into evidence did not hinder his defense, as counsel ably elicited the relevant details from those

reports and documents through his examination of key witnesses.

Petitioner also specifically alleges that he was prejudiced as a result of certain information that came out during the course of trial, e.g. his past drug use, sexual practices, his use of an alias. Again, for the reasons previously articulated in this section's *Strickland* analysis above, the fact that this information came out at trial was either permissible or not the result of misconduct on the part of the prosecutor. Thus, Petitioner has failed to meet his burden in demonstrating that he suffered actual prejudice.

Finally, Petitioner also cannot show that this Court's failure to consider his third and fifth habeas claims would result in a miscarriage of justice. *Coleman*, 501 U.S. at 750. In *Schlup v. Delo*, 513 U.S. 298, 321 (1995), the Supreme Court described the scope of the fundamental miscarriage of justice exception:

> To ensure that the fundamental miscarriage of justice exception would remain "rare" and would only be applied in the "extraordinary case," while at the same time ensuring that the exception would extend relief to those who were truly deserving, the Court explicitly tied the miscarriage of justice exception to the petitioner's innocence.

To meet the threshold requirement for actual innocence, a petitioner must persuade the court "that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Id.* at 329. *See*, e.g., *Paffousen v. Grayson*, No. 00-1117, 2000 WL 1888659 at *3 (6th Cir. Dec.19, 2000) ("in order to establish actual innocence a petitioner must show that it is more likely than not that no reasonable juror would have convicted him"). Evidence sufficient to establish actual innocence "normally consists of exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence that was not presented at trial." *Paffousen*, 2000 WL 1888659 at *3.

Petitioner offers no such new evidence that he is actually innocent of the crime for which he

was convicted. Accordingly, petitioner has failed to meet the fundamental miscarriage of justice exception.

Here, the evidence against Petitioner was overwhelming. First, Petitioner made many incriminating statements over the years, to several different individuals, which implicated him in the 1974 murder. Second, Petitioner's fingerprints were found at the crime scene, in a unique position where the murderer had to have been in order to have strangled the victim. Third, Petitioner's ex-wife, Terry Igaz, provided testimony that showed that Petitioner was not at his honeymoon get-a-way the entire night prior to, and morning of, the victim's murder, as he had previously claimed to police. While Petitioner presented a vigorous defense, the jury found Petitioner was guilty on the evidence presented.

Petitioner's third and fifth habeas claims are therefore procedurally defaulted. He has failed to demonstrate cause for this procedural default and has failed to establish prejudice or demonstrate a miscarriage of justice in order to excuse the procedural default of these claims. Against that backdrop, the Court concludes that Petitioner is not entitled to habeas relief on these claims.

### E.  Claim VI–Ineffective Assistance of Counsel

In his sixth habeas claim, Petitioner asserts that his Sixth Amendment right to effective assistance of counsel was violated. Specifically, Petitioner argues that his defense counsel (1) failed to object to the prejudicial hearsay testimony of prosecution witnesses Linda Fairbanks and Detective Thomas Reeder, (2) failed to object to prosecution witness Dr. Kanu Virani's speculative testimony about Dr. Ronald Hines's supposed incompetence, (3) failed to object to the reading into evidence of the unsworn, uncross-examined statement of Patti Skeba to the Saginaw police, (4)

failed to present an adequate defense by failing to obtain a defense expert to examine the hair evidence, (5) failed to understand the Michigan Rules of Evidence, and (6) failed to call certain witnesses. Petitioner also alleges that the cumulative effect of all these errors denied him his Sixth Amendment right to effective assistance of counsel. Petitioner raised these allegations on direct appeal but the Michigan Court of Appeals rejected them, stating:

> Defendant also claims his trial counsel should have objected to various hearsay testimony including the testimony regarding defendant's sexual practices, testimony concerning defendant's alleged attempted rape of Igaz, and testimony from Fairbanks that Patricia Skeba told her that defendant was talking about the victim's murder. As already noted above, the testimony regarding defendant's sexual practices and the redirect testimony regarding alleged statements that defendant attempted to rape Igaz were properly admissible and, therefore, defendant's trial counsel's objection would have been futile. Likewise, the testimony by Fairbanks that Patricia Skeba told her that defendant was talking about the victim's murder appears to have been offered to explain Fairbanks'[s] distraught state at the time the conversation occurred and not to prove the truth of the matter asserted. Therefore, it was not hearsay. MRE 801.

> Defendant next claims his counsel was ineffective for failing to object to Virani's "speculative testimony" about Hines'[s] incompetence. We find no merit to this claim. Virani did not characterize Hines as incompetent, but rather explained how Hines'[s] inexperience in forensic pathology might have affected his conclusions regarding the exudate found in the victim. Because this testimony was within the realm of Virani's expertise, it was properly admissible. Thus, defendant's trial counsel could not be faulted for failing to object to it.

> Defendant next claims that his trial counsel was ineffective because he stipulated to the admission of Patricia Skeba's prior statement, where the statement was made to the police, may not have been under oath, and where defendant did not have the opportunity to cross-examine her statement. We disagree.

> At defendant's second trial, Patricia Skeba was called by the prosecution and asked about a statement she made to the police in 1976. While Patricia indicated that she recalled making a statement, she testified that she could not recall the details of the statement and could not independently recollect the events described in the statement. Based on this testimony, the prosecutor moved for the admission of the prior recorded statement under MRE 803(5). The trial court granted the motion after Reeder testified concerning how and when the statement was taken. Thereafter, Patricia read her statement into the record and, after she finished, defendant's trial

counsel had the opportunity to cross-examine her. Because Patricia appeared at defendant's second trial, her statement to the police was not barred by the Confrontation clause of the Sixth Amendment. At defendant's third trial, the prosecutor could have repeated the same procedure to obtain the admission of Patricia's 1976 statement. Consequently, defendant's trial counsel's decision to stipulate to the admission of Patricia's testimony could not have prejudiced defendant and, therefore, cannot constitute ineffective assistance.

Finally, defendant argues that his trial counsel was ineffective for failing to obtain an expert on hair evidence, for electing to attempt to elicit crucial testimony through hearsay statements rather than by calling the relevant witnesses, and for failing to provide a basis for admitting the police reports. We disagree.

A trial counsel's decision whether to call a witness is presumed to be a matter of trial strategy. Furthermore, in order to establish the predicate for his claim, defendant must offer proof that an expert would have testified favorably if called for the defense, which he has not done. In addition, defendant's trial counsel conducted a thorough and effective cross-examination of plaintiff's hair expert and effectively argued that the numerous hairs found on the victim could not be adequately explained through secondary transfer. On this record, we cannot conclude that defendant's trial counsel's decision not to retain the services of a hair expert as anything other than sound trial strategy. Likewise, defendant's assertion that his trial counsel could have obtained the admission of various witness statements through Carlson had he had a better understanding of the hearsay rule is nothing more than speculation as is his assertion that his trial counsel should have called the relevant witnesses. Finally, we have already noted that the admission of the information contained in the police reports would merely have been cumulative to the testimony elicited from the officers who actually conducted the investigation and, therefore, the failure to find a way to obtain their admission did not affect the outcome of the trial.

Defendant has failed to meet his burden of establishing that his trial counsel's performance fell below an objective standard of reasonableness and that this performance affected the outcome of his trial. Consequently, a new trial on this basis is not warranted.

*Ferris*, 2006 WL 473769, at *13-15 (citations omitted).

As stated in the preceding section, the *Strickland* test applies to ineffective assistance of counsel allegations. Regarding these allegations, the Court finds that defense counsel's performance was not unreasonable.

Contrary to Petitioner's position, the testimony in question, from both Linda Fairbanks and

Detective Reeder, was admissible and there was no basis for defense counsel to object. Linda Fairbanks testified about a car trip that she took to Ann Arbor with Petitioner, Patti Skeba, and Thomas Skeba during the fall of 1976. Fairbanks related that, in the course of that trip, she heard Petitioner make incriminating statements concerning his involvement in the murder of the victim, Cheryl Miller. Fairbanks explained, "I was crying uncontrollably because I was scared. And I knew it was about something really bad, that he hurt somebody or that it was a murder." Trial Tr. vol. VI, 119, May 20, 2004. Fairbanks then related that it was Patti Skeba's definitive statement to her that "[i]t was about [Petitioner] killing Cheryl Miller" that contributed to her being upset. Trial Tr. vol. VI, 119, May 20, 2004. Thus, based on that record, the Court of Appeals's determination that Patti's statement to Fairbanks was not hearsay under the Michigan Rules of Evidence because it was offered to explain Fairbanks's distraught state at the time the conversation occurred and not to prove the truth of the matter asserted is correct. *Ferris*, 2006 WL 473769, at \*13. Accordingly, defense counsel's failure to object was no unreasonable.

As to Detective Reeder, he testified on direct examination about what Terry Igaz had told him concerning Petitioner's regular sexual practice of withdrawing from intercourse before climaxing. He also testified on re-direct examination about Terry Igaz's account of Petitioner's attempted rape of her in front of some of his friends. Because the trial court had previously ruled that such other acts evidence was admissible, Detective Reeder's testimony was admissible, as the Court of Appeals properly determined. Accordingly, defense counsel's failure to object to that testimony was not unreasonable.

Turning to Petitioner's allegations of ineffective assistance of counsel regarding counsel's failure to object to Dr. Virani's testimony, Petitioner has also failed to demonstrate how counsel's

performance fell below an objective standard of reasonableness. Dr. Virani, as a properly qualified expert witness, appropriately testified concerning Dr. Hines's conclusions, as the Court of Appeals rightly concluded. Moreover, there was no prejudice to Petitioner as a result of of Dr. Virani's testimony. Petitioner's own expert, Dr. Michael Welsh, indicated that he had reviewed the slides made by Dr. Hines and could not say whether the vaginal smear sample was semen or not because "there was no sperm." Trial Tr. vol. VIII, 166, May 25, 2004. Dr. Welsh also testified that if you found one degenerated sperm, you would expect to find "many, many" more. Trial Tr. vol. VIII, 173-175, May 25, 2004. Contrary to the assertion of the defense, Dr. Hines did not conclude that the creamy fluid was semen, he explained that it looked as if it could have been ejaculate and that he thought he saw one isolated spermatozoa, but he did not conduct any tests on the fluid sample.

In light of both the testimony of Drs. Welsh and Hines, it cannot be said that defense counsel's failure to object to Dr. Virani's testimony was so prejudicial so as to be outcome determinative.

As to Petitioner's allegations that defense counsel was ineffective for failing to object to the reading into evidence of Patti Skeba's 1976 statement, the Court finds that it is without merit. The Sixth Amendment guarantees criminal defendants the right to confront witnesses against them. The primary concern of confrontation clause is the right of the criminal defendant to test the credibility of the witnesses through cross-examination. *Davis v. Alaska*, 415 U.S. 308, 315-16 (1974). "Testimonial statements of witnesses absent from trial [are] admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Crawford v. Washington*, 541 U.S. 36, 59 (2004).

Contrary to Petitioner's assertion, the trial court's admitting into evidence of Patti Skeba's 1976 statement did not violate *Crawford*. *Crawford* does not apply because defense counsel had an opportunity to and did cross-examine Patti Skeba during the February, 2004, trial, where her 1976 statement to police was read into evidence.

Here, counsel's decision at the May 2004 trial to stipulate to the reading into evidence of Skeba's 1976 statement was a matter of trial strategy and counsel's decision not to contest the admissibility of this statement was not unreasonable. Nor was counsel's failure to object prejudicial, because the admission of Skeba's 1976 statement at Petitioner's May 2004 trial did not violate Petitioner's Sixth Amendment rights under *Crawford*.

With respect to Petitioner's allegation that his counsel was ineffective for failing to present an adequate defense, the Court finds the allegation is without merit. Specifically, Petitioner claims that it was unreasonable for defense counsel not to have at least requested, if not obtained, a trace evidence expert to testify regarding the defense's theory that the hairs found on the victim's body were those of the real killer. Counsel's performance was not unreasonable given that Petitioner has not shown how such an expert would have substantially contributed to the defense's theory. Rather, it was a matter of trial strategy on the part of counsel on how to best contest the prosecution's theory of secondary hair transfer as an explanation for the presence of at least five hairs on the victim's body that were not hers or Petitioner's. Counsel chose to pursue this avenue of attack through a vigorous cross-examination of the prosecution's trace evidence expert, Richard Bisbing. Counsel's performance was neither unreasonable nor prejudicial. As the Court of Appeals found, counsel "effectively argued that the numerous hairs found on the victim could not be adequately explained through secondary transfer." *Ferris*, 2006 WL 473769, at *14.

Additionally, Petitioner's contention that counsel's performance fell below an objective standard of reasonableness because counsel did not adequately comprehend the Michigan Rules of Evidence, particularly concerning hearsay matters, is unfounded. With respect to Petitioner's argument that counsel's direct examination of Detective Robert Carlson evidenced a failure to comprehend the hearsay rules effectively, Petitioner has not shown that a different line of questioning by counsel would have produced more favorable testimony to the defense. Moreover, Petitioner has not shown that a failure on the part of counsel to call some of the individuals that Detective Carlson was questioned about on direct examination prejudiced Petitioner in any meaningful way.

Finally, because Petitioner has not demonstrated any constitutional error with respect to counsel's performance in any of the areas he complains of, his cumulative effect argument necessarily fails. The United States Supreme Court "has not held that distinct constitutional claims can be cumulated to grant habeas relief." *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002). In other words, the cumulative weight of alleged constitutional trial errors in a state prosecution does not warrant federal habeas relief because there is no clearly established federal law permitting or requiring the cumulation of distinct constitutional claims to grant habeas relief. *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005). Therefore, the Court concludes that Petitioner is not entitled to habeas relief on the grounds of cumulative error. *Id.*

Against that backdrop, the Court concludes that Petitioner's sixth habeas claim is without merit because he has not shown that his trial counsel provided ineffective assistance in a constitutionally deficient manner. The state court adjudications of Petitioner's sixth habeas claim were neither contrary to, nor an unreasonable application of, clearly established United States

Supreme Court precedent, or an unreasonable determination of the facts. The Court finds that Petitioner is not entitled to habeas relief regarding this claim.

### F. Certificate of Appealability

"[A] prisoner seeking postconviction relief under 28 U.S.C. § 2254 has no automatic right to appeal a district court's denial or dismissal of the petition. Instead, [the] petitioner must first seek and obtain a [certificate of appealability.]" *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U .S.C. § 2253(c)(2).

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong . . . . When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a [certificate of appealability] should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

The Court concludes that reasonable jurists would not find its assessment of Petitioner's claims debatable or wrong. The Court therefore declines to issue Petitioner a certificate of appealability and leave to proceed on appeal *in forma pauperis*.

### IV. CONCLUSION

Accordingly, **IT IS ORDERED** that the "Petition for Writ of Habeas Corpus" [dkt. # 1] is **DENIED**.

**IT IS FURTHER ORDERED** that the Court declines to issue Petitioner a certificate of appealability and leave to proceed on appeal *in forma pauperis* because any appeal would be

frivolous.  *See* Fed.R.App.P. 24(a).


s/John Corbett O'Meara
United States District Judge

Date:  June 18, 2010



    I hereby certify that a copy of the foregoing document was served upon the parties of record on this date, June 18, 2010, using the ECF system and/or ordinary mail.


s/William Barkholz
Case Manager
